In re **GRAND JURY PROCEEDINGS.**

Appeal of Intervenor, Louis C. JOHANSON, in No. 80–1418.

Appeal of UNITED STATES of America, in No. 80–1419 and No. 80–1456.

UNITED STATES ex rel., L.C.J., Petitioner,

v.

Honorable Donald W. VanARTSDALEN.

Nos. 80–1364, 80–1365, 80–1418, 80–1419 and 80–1456.

United States Court of Appeals, Third Circuit.

Argued June 11, 1980.

Decided Aug. 21, 1980.

---

John Rogers Carroll, Carroll, Creamer, Carroll & Duffy, Philadelphia, Pa., for appellant in Nos. 80–1364 and 80–1418; appellee in Nos. 80–1419 and 80–1456 and petitioner in No. 80–1365.

Bonnie Brigance Leadbetter, Asst. U. S. Atty., Philadelphia, Pa., argued for appellee in Nos. 80–1364 and 80–1418 and appellant in Nos. 80–1419 and 80–1456 and respondent in No. 80–1365.

Before HUNTER, WEIS and SLOVITER, Circuit Judges.

OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge.

This appeal arises from the multidistrict undercover investigation (Abscam) conducted by the Justice Department and the Federal Bureau of Investigation into alleged corrupt activities of government officials. Prior to the initiation of a Grand Jury investigation into the alleged corrupt practices of Louis C. Johanson,[1] he was publicly

1. No grand jury had been convened at the time of the leaks to the press. Govt's response to Petition for Writ of Mandamus, 80–1365, at 1, and Movant's reply memo, 80–0147 at B5, Appendix.

named as a target of the Abscam investigation. This public disclosure was made contrary to Justice Department regulations requiring confidentiality of pending criminal investigations,[2] and further violated the local rules of court for the Eastern District of Pennsylvania,[3] and the A.B.A. Canons of Professional Ethics.[4] In this appeal Johanson seeks review of a denial of his motion for an evidentiary hearing for the purpose of securing the identities of the persons who divulged the information. Alternatively he has filed a petition for mandamus to require the district court to grant the evidentiary hearing.

The government in its appeal seeks review of a district court order partially quashing a subpoena duces tecum on fifth amendment grounds. For reasons set forth in the discussion that follows, the orders of the district court will be affirmed.

2. Justice Department regulations require:

At no time shall personnel of the Department of Justice furnish any statement or information for the purpose of influencing the outcome of a defendant's trial, nor shall personnel of the Department furnish any statement or information, which could reasonably be expected to be disseminated by means of public communication, if such a statement or information may reasonably be expected to influence the outcome of a pending or future trial. 28 C.F.R. § 50.2(b)(2) (1979).

3. Rule 2 of the Local Rules of Criminal Procedure Pennsylvania (E.D.) provides that Local Civil Rule 43 shall be fully applicable in all criminal proceedings. Local Civil Rule 43 titled *Release of Information by Attorneys and Court House Personnel in Criminal Cases; Widely Publicized Cases* provides in relevant part:

(a) The Duty of Attorneys

(2) With respect to a grand jury *or other pending investigation of any criminal matter*, a lawyer participating in the investigation shall refrain from making any extrajudicial statement, for dissemination by any means of public communication, that goes beyond the public record or that is not necessary to inform the public that the investigation is underway, *to describe the general scope of the investigation*, to obtain assistance in the apprehensive of a suspect, to warn the public of any dangers, or otherwise to aid in the investigation. (emphasis added)

4. Rule 11 of the Federal Local Court Rules for Pennsylvania (E.D.) titled *Canons of Ethics* provides:

### I.

Press accounts identified Louis C. Johanson as a target of the pending Abscam investigation. Quoting government sources, the press reported that he had been videotaped on two occasions, July 26, 1979 and January 18, 1980, and that the latter videotape depicted him receiving a sum of money from government undercover agents posing as businessmen. Although the press did not disclose its sources, it attributed the information to federal employees.

In the course of grand jury proceedings, Johanson moved for a protective order including an evidentiary hearing to identify the federal employees who released the confidential information pertaining to the criminal investigation.[5] Johanson alleged that he sought their identities to enable him

The canons of ethics of the American Bar Association as now existing shall be and as hereafter modified shall become standards of conduct for attorneys of this court.

The A.B.A. Code D.R. 7–107 is adopted by Local Rule 11 of the Federal Local Court Rules for Pennsylvania (E.D.) and is therefore applicable. A.B.A. Code D.R. 7–107 provides:

(A) A lawyer participating in or associated with the investigation of a criminal matter shall not make or participate in making an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication and that does more than state without elaboration:

(1) Information contained in a public record.

(2) That the investigation is in progress.

(3) The general scope of the investigation including a description of the offense and, if permitted by law, the identity of the victim.

(4) A request for assistance in apprehending a suspect or assistance in other matters and the information necessary thereto.

(5) A warning to the public of any dangers. A.B.A. Code D.R. 7–107.

5. In proceedings before the district court Johanson requested the following relief: *Appendix B–17, 18.* (a) Evidentiary hearing; (b) Stay of grand jury proceedings; (c) Special instructions and voir dire of grand jury; (d) Designation of the case as a "Widely Publicized Case" under Rule 43 of the Local Civil Rules for the Eastern District of Pennsylvania; (e) Disqualification of certain justice department personnel; and (f) Further Rule 6(e) restrictions.

to move for their disqualification from participating in grand jury proceedings on the theory that their participation would taint the proceedings in violation of his fifth amendment right to an impartial grand jury.[6] On March 3, 1980 the district court entered an order denying Johanson's motion for permission to investigate the identities of the persons responsible for the unauthorized disclosures. Johanson appeals the denial and alternatively seeks mandamus to compel the district court to grant the requested hearing to investigate and identify the source of the leaks.

 On February 2, 1980 Johanson met with agents of the Federal Bureau of Investigation and described particular documents which might be of evidentiary value to the Abscam investigation. Johanson, an attorney and Philadelphia City Councilman, entered into discussions through his original counsel regarding turning these documents over to the F.B.I. Subsequently he retained new counsel who sent a letter to the prosecutor, dated February 6, 1980, itemizing the documents Johanson had placed in his possession for purposes of professional advice and informing the prosecutor of Johanson's refusal to transfer the documents to aid the investigation. The grand jury then subpoenaed Johanson's counsel to produce the documents itemized in the February 6 letter.[7] Counsel moved to quash the subpoena on grounds of the attorney-client privilege and Johanson's fifth amendment privilege.[8] Johanson was permitted to intervene in the motion to quash by the district court and he therefore has standing here to defend the district court decision quashing a portion of the subpoena. In orders dated March 17, and March 28, 1980, the motions to quash were partially granted. The district court quashed the portions of the subpoena requiring production of Johanson's pocket-size appointment books for the years 1979 and 1980 which Johanson kept on his person. The district court reasoned that the appointment books were Johanson's personal papers, that submission would constitute authentication, a testimonial act, and that matter in the appointment book would tend to incriminate him. For these reasons the district court conclud-

---

**6.** We do not intimate any view on the question whether the grand jury proceedings would be tainted if the prosecutors who participated had previously divulged information to the press. Nevertheless, the purpose articulated by Johanson as underlying his request for an evidentiary hearing—to avoid investigation before the grand jury by a federal prosecutor who had disclosed the information—could be achieved by a much less intrusive tool than an investigation to identify the informants. Johanson could simply have asked the district court to require the participating prosecutors to disclose whether they had leaked information. *See In re Grand Jury Investigation, (Lance),* 610 F.2d 202 (5th Cir. 1980) (Where government attorneys refused to submit affidavits denying that they or their staff had disclosed grand jury matters to the press, after several newspaper articles identified their sources as government attorneys, a sufficient showing of a violation of Rule 6(e) was made to warrant a hearing on a motion to hold the government attorneys in civil contempt). By this means Johanson could have obtained the results he allegedly desired—knowledge of whether the prosecutors had divulged confidential information—without a grand scale judicial investigation duplicating the Justice Department's inquiry into the identities of the persons who disclosed the information to the press.

**7.** The subpoena duces tecum sought "any and all notes, memoranda, appointment books and diaries, sketches, blueprints, investment and finance plans and telephone call logs concerning any of the following entities or persons: Abdul Enterprises, Abdul Enterprises, Inc., Abdul Industries, Inc., Michael S. Cohen, Anthony DeVito and/or Melvin Weinberg, as indicated in your letter of February 6, 1980 attached hereto and incorporated by reference."

**8.** *See Fisher v. United States,* 425 U.S. 391, 402–05, 96 S.Ct. 1569, 1576–1578, 48 L.Ed.2d 39 (1976). In *Fisher* the Supreme Court held that the attorney–client privilege applied to documents in the hands of an attorney which would have been privileged in the hands of the client by reason of the fifth amendment. Pre-existing documents which could have been obtained by court process from the client when he was in possession may be obtained from the attorney by similar process following transfer by the client to the attorney. In other words, where the transfer is made for the purpose of obtaining legal advice, the purpose of the attorney–client privilege would be defeated unless the privilege is applicable.

ed that the grand jury could not compel production because to do so would violate Johanson's fifth amendment right to be free from self-incrimination. The government here appeals the orders denying production of Johanson's two appointment books.

Johanson has requested that this court stay the grand jury proceedings to prevent his being indicted before resolution of the issues presented by this appeal. We have refused to interrupt the grand jury's investigation or to delay its decision as to whether or not criminal proceedings should be instituted against Johanson. "The grand jury's investigative powers must be broad if its public responsibility is adequately to be discharged." *United States v. Calandra*, 414 U.S. 338, 344, 94 S.Ct. 613, 618, 38 L.Ed.2d 561 (1973). *See In re Grand Jury Proceedings, (U.S. Steel)*, 525 F.2d 151 (3d Cir. 1975) (vacating an order that stayed grand jury proceedings). On May 22, 1980, the grand jury returned an indictment against Louis C. Johanson.

## II.

We turn to the question whether the district court abused its discretion in denying an investigation into the source of the unauthorized disclosures. The district court order was entered while the grand jury investigated Johanson's activities. As an initial matter we must determine whether this is an appealable order which we have the power to review. The question is whether a preindictment order denying a motion for an evidentiary hearing is an order which is immediately appealable as a collateral order under *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed.2d 1528 (1949).

Johanson has founded his claim of appealability on the general rule of this court which permits appeals from orders denying disqualification of counsel. *See, e. g., Ackerly v. Red Barn Systems, Inc.*, 551 F.2d 539 (3d Cir. 1977); *Kroungold v. Triester*, 521 F.2d 763 (3d Cir. 1975). *Cf. In re Fine Paper*, 617 F.2d 22 (3d Cir. 1980). Although he characterizes the order as one denying disqualification of the prosecutor from participating in grand jury proceedings, such characterization is premature, if not inaccurate. The motion Johanson made requested a discovery device in the form of an evidentiary hearing to learn who disclosed the confidential information. His request was denied by the district court. No motion to disqualify has been made. Therefore no motion to disqualify has been denied. The appealability rule governing disqualification of counsel cannot serve as the jurisdictional prerequisite here.

 Appeals before a final judgment terminating the criminal proceedings in the district court are strongly disfavored.[9] For an order to be appealable before a final judgment, it must meet the requirements of the collateral order doctrine. These requirements, originally formulated in *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 545–47, 69 S.Ct. 1221, 1225–1226, 93 L.Ed.2d 1528 (1949),[10] have recently been restated

---

**9.** *E. g., United States v. MacDonald*, 435 U.S. 850, 98 S.Ct. 1547, 56 L.Ed.2d 18 (1977); *Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977); *Will v. United States*, 389 U.S. 90, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967); *DiBella v. United States*, 369 U.S. 121, 82 S.Ct. 654, 7 L.Ed.2d 614 (1962); *Cobbledick v. United States*, 309 U.S. 323, 60 S.Ct. 540, 84 L.Ed. 783 (1940).

**10.** In *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 545–47, 69 S.Ct. 1221, 1225, 1226, 93 L.Ed.2d 1528 (1949) the Supreme Court held that to be collaterally appealable an issue must fall within that small class of cases which finally determine claims of right separable from and collateral to the rights asserted in the action,

and are too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated.

*Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977) applied the *Cohen* "collateral order" doctrine to a criminal proceeding. *Abney* held that, although the pretrial denial of a motion to dismiss an indictment on double jeopardy grounds is obviously not "final" in the sense that it terminates the criminal proceedings in the district court, nonetheless, such pretrial orders fall within the "collateral order" exception. The rights conferred on a criminal accused by the double jeopardy clause would be significantly undermined if appellate review of double jeopardy claims

by the Supreme Court in *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 468, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978): the order must conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and be effectively unreviewable on appeal from a final judgment.

■ The order of the district court, denying the evidentiary hearing, does not satisfy two of the three criteria for immediate appealability. Although it is collateral to the issue of Johanson's innocence or guilt, it is capable of effective review after final judgment, and therefore no irreparable harm will result by delayed review. Moreover, it does not conclusively determine the disputed question.

■ Johanson moved for the evidentiary hearing to learn who had divulged information to the news media in order to have them disqualified from participating in grand jury proceedings. He did this in order to protect his fifth amendment guarantee of indictment by an impartial grand jury. But flawed grand jury proceedings can be effectively reviewed by this court and remedied after a conviction has been entered and all criminal proceedings have been terminated in the district court. *E. g., Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1955) (Post conviction review of sufficiency of the basis for grand jury's issuance of indictment). Because delayed appellate review will not irreparably deny Johanson his right to an impartial grand jury (his conviction could

be reversed if at a later stage we conclude the grand jury was tainted), the order is not reviewable immediately as a collateral order. *Cf. Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977) (permitting jurisdiction over a pretrial denial of a motion to dismiss indictment on double jeopardy grounds because of the guarantee that a defendant not be twice *put* in jeopardy, i. e., not twice *placed* on trial).

Furthermore, the issue whether Johanson should have the opportunity to learn who disclosed information to the news media has not been conclusively decided by the order of the district court which Johanson here urges us to review. He has raised the issue anew in the district court, in a motion to quash the indictment. Thus the first order denying the hearing did not finally determine the question. Therefore we conclude that we have no appellate jurisdiction under the *Cohen* doctrine of collateral appealability over the pretrial order denying the evidentiary hearing.[11]

■ Moreover, with the return of the indictment against Johanson on May 22, 1980 the question whether the persons responsible for the unauthorized disclosures should be disqualified from participating in grand jury proceedings has become moot. Johanson's narrow premise for the requested investigation—to disqualify those responsible for disclosures from grand jury proceedings—is moot because the indictment prevents the grand jury from lawfully in-

were postponed until after conviction and sentence. The double jeopardy clause not only protects an individual against more than being subject to double punishments; it is a guarantee against being twice put to trial for the same offense." 431 U.S. at 660–62, 97 S.Ct. at 2040–2041.

11. One court has accepted appellate jurisdiction over an order that denied a motion for contempt sanctions against government attorneys who had allegedly disclosed grand jury matters in violation of Rule 6(e) of the Federal Rules of Criminal Procedure. *In re Grand Jury Investigation,* (*Lance*), 610 F.2d 202 (5th Cir. 1980). The court permitted review because it believed "acquittal or conviction would so obscure the claim of a personal remedy for grand

jury irregularity as to render it meaningless." *Id.* at 213. Yet the rule of appealability in contempt proceedings is hardly new. *See 9 Moore's Federal Practice* ' 110.13[4]. Thus *Lance* does not provide us with a departure from the policy against piecemeal appellate review of criminal proceedings. Nor does it provide much guidance to the appealability question presented in this case because the facts here cannot be characterized as contempt proceedings. Rather, Johanson sought to identify (and disqualify) persons who had leaked and thereby prevent allegedly tainted grand jury proceedings. He did not, as in *Lance,* seek the identities for the purpose of having contempt sanctions applied.

vestigating him further with respect to the offense which is the subject of the indictment. *E. g., United States v. Fisher,* 455 F.2d 1101 (2d Cir. 1972). In that a presumption of regularity attaches to grand jury proceedings, *In re Grand Jury Proceedings, (Schofield I),* 486 F.2d 85, 92 (3d Cir. 1973), this court must presume that the prosecutors no longer participate in a grand jury investigation of Johanson. The grand jury could lawfully investigate Johanson as to offenses not charged in the pending indictment, but there is no factual suggestion that this is the situation here. Therefore presently there are no grand jury proceedings against Johanson from which those responsible for disclosing information to news media could be disqualified.

■ The question of the appropriateness of issuing the writ of mandamus to compel the district court to order the investigation, in order to disqualify prosecutors from participating in grand jury proceedings, is also mooted by the indictment. For a discussion of the appropriateness of issuing a writ of mandamus, *see Commonwealth of Pennsylvania v. Newcomer,* 618 F.2d 246 (3d Cir. 1980). *See generally 9 Moore's Federal Practice* ¶ 110.28. We emphasize, however, that the writ of mandamus may not be used "to review an interlocutory procedural order in a criminal case" which does not have the effect of a dismissal and corresponding finality of judgment. *Will v. United States,* 389 U.S. 90, 97–98, 88 S.Ct. 269, 275, 19 L.Ed.2d 305 (1967).

### III.

■ The district court selectively quashed the subpoena issued by the grand jury and the United States here appeals. Jurisdiction over the appeal is conferred by 18 U.S.C. § 3731. *In re Grand Jury Empanelled, (Colucci),* 597 F.2d 851, 854–56 (1979). Before addressing the correctness of the district court's conclusion that the fifth amendment shields Johanson's attorneys from producing Johanson's pocket appointment books, we will first examine whether the intervening indictment of Johanson precludes compliance with the grand jury sub-

poena duces tecum. Courts have general supervisory powers over the grand jury to prevent or correct abuse of its process or violation of the constitutionally protected rights of witnesses. *In re Grand Jury Proceedings, (Schofield I),* 486 F.2d 85, 89 (3d Cir. 1973). Johanson contends that because his indictment prevents the grand jury from continuing to investigate him that enforcement of the subpoena directed against his attorneys is moot. This contention presents two analytically distinct questions: whether return of the indictment against Johanson moots a subpoena issued to his attorneys prior to Johanson's indictment and whether return of the indictment against Johanson provides a basis for noncompliance with the grand jury subpoena. Although we are not certain whether Johanson intended to raise both issues, we shall address each because of their significance in deciding this case on a ground alternative to the fifth amendment.

■ As to the mootness question, the fact that Johanson has been indicted does not render enforcement of a subpoena issued to his attorneys, seeking production of his pocket diaries, moot. *See In re Russo,* 448 F.2d 369, 374 (9th Cir. 1971). Johanson's indictment did not bring the grand jury's proceedings to its conclusion. The grand jury that issued the subpoena is still in session investigating the criminal activities of persons other than Johanson. So long as the grand jury continues with its investigation into the criminal activities of unindicted persons, then a subpoena, relevant to the lawful inquiry, retains vitality and is not unenforceable on mootness grounds. "A grand jury's investigation is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed." *United States v. Dionisio,* 410 U.S. 1, 13, 93 S.Ct. 764, 771, 35 L.Ed.2d 67 (1973). Here the grand jury has not finished examining every clue, and one indictment does not render enforcement of the subpoena seeking records of the indicted person moot so long as the records sought are relevant to the continuing inves-

tigation of the grand jury. Therefore, while the grand jury proceeds to investigate the activities of others, enforcement of its subpoena for relevant documents of Johanson is not moot by reason of the intervening Johanson indictment.

We turn to the second challenge Johanson might have been seeking to raise, whether the intervening indictment of Johanson itself bars his attorneys from complying with the subpoena. It is a firmly entrenched rule that once a defendant has been indicted, a prosecutor may not use a grand jury's investigative powers for the purpose of securing additional evidence against the defendant for use in the upcoming trial. *E. g., United States v. Woods*, 544 F.2d 242, 249 (6th Cir. 1976); *United States v. Fisher*, 455 F.2d 1101, 1104–05 (2d Cir. 1972); *United States v. Star*, 470 F.2d 1214, 1217 (9th Cir. 1972); *In re National Glass Workers*, 287 F. 219 (N.D.Ohio 1922). But a good faith inquiry into other charges within the scope of the grand jury's lawful authority is not prohibited even if it uncovers further evidence against an indicted person. *See, e. g., United States v. Dardi*, 330 F.2d 316, 336 (2d Cir. 1964), *cert. denied*, 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed. 50 (1964). This policy has in turn fostered another rule, that the return of an indictment does not provide any legal basis for a subpoenaed witness to refuse to comply with the grand jury subpoena so long as a lawful grand jury proceeding continues. *In re Grand Jury Proceedings, (Pressman)*, 586 F.2d 724, 725 (9th Cir. 1978); *United States*

*v. Woods*, 544 F.2d 242, 249–50 (6th Cir. 1976), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977); *Beverly v. United States*, 468 F.2d 732, 743 (5th Cir. 1972); *United States v. George*, 444 F.2d 310, 314 (6th Cir. 1971). Thus the witnesses here subpoenaed, attorneys for Johanson, cannot refuse to comply with a grand jury subpoena merely because Johanson was indicted subsequent to the service of the subpoena.[12]

Furthermore, this avenue of resisting compliance with the grand jury subpoena is unavailable to Johanson because the burden is his to demonstrate that the sole or dominant purpose of seeking the evidence post indictment is to prepare for the pending trial. *Universal Manufacturing Co. v. United States*, 508 F.2d 684, 685 (8th Cir. 1975); *United States v. Woods*, 544 F.2d 242, 250 (6th Cir. 1976), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977); *Beverly v. United States*, 468 F.2d 732, 743 (5th Cir. 1972). Johanson has not made any factual showing that the grand jury's sole or dominant purpose for seeking enforcement of the subpoena is to continue, unlawfully, to investigate him subsequent to his indictment. In the absence of a contrary factual showing, the grand jury proceedings are entitled to a presumption of lawfulness and regularity. *In re Grand Jury Proceedings, (Schofield I)*, 486 F.2d 85, 92 (3d Cir. 1973). Although absent a factual showing of irregularity beyond mere suspicion the prosecutor need not submit an affidavit affirming that the grand jury

12. "The Fifth Amendment is limited to prohibiting the use of 'physical or moral compulsion' exerted on the person asserting the privilege." *Fisher v. United States*, 425 U.S. 391, 397, 96 S.Ct. 1569, 1574, 48 L.Ed.2d 39 (1976); *Couch v. United States*, 409 U.S. 322, 329, 93 S.Ct. 611, 616, 34 L.Ed.2d 548 (1973) (no violation of fifth amendment rights of taxpayer by enforcing summons directed against taxpayer's accountants). Subpoenas addressed to third persons do not compel the accused person to act as a witness himself in derogation of his fifth amendment rights. Some situations may exist where "constructive possession [is] so clear or relinquishment of possession so temporary and insignificant as to leave the personal compulsion" upon the accused "substan-

tially intact" even though the subpoena is directed against a third person. *Fisher*, 425 U.S. at 398, 96 S.Ct. at 1574. Whether an indicted person need not comply with a grand jury subpoena is not an issue in this case, Johanson's attorneys having been served and not Johanson, and we therefore do not posit an answer here. *Compare In re Grand Jury Proceedings*, 586 F.2d 724, 725 (9th Cir. 1978) ("There is no legal basis for barring a grand jury investigation simply because there is an outstanding indictment involving persons not being called as witnesses.") *with United States v. George*, 444 F.2d 310 (6th Cir. 1971) (indicted person held in contempt for failing to answer grand jury questions after his indictment).

seeks the documents in aid of its investigation of other persons, he has done so here. He has therewith discharged the government's burden. *See Id.*

Because the grand jury seeks the documents in connection with an investigation of persons other than Johanson, we conclude that Johanson's indictment is not a bar to enforcement of the subpoena. If an unlawful purpose in seeking enforcement of the subpoena is shown, this court will not hesitate to fashion an appropriate remedy.[13] But on these facts the issuance of the indictment against Johanson does not prevent enforcement of the grand jury subpoena issued to his attorneys.

## IV.

■ This brings us squarely to the question whether Johanson's attorney has any other legal basis for refusal to comply with the subpoena to produce Johanson's pocket diaries.[14] Johanson's attorney has invoked the attorney–client privilege. That privilege provides legal basis for refusing to produce the documents if the transfer of documents is made for the purpose of obtaining legal advice and if the documents in the hands of the client would have been privileged from production. *Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). If the preexisting date books could have been obtained from Johanson by subpoena, then the attorney–client privilege does not protect the documents from a subpoena directed against an attorney.

■ The question to be decided is whether the fifth amendment rights of Jo-

hanson would be violated if he were required to produce his personal appointment books for the years 1979, 1980 by order of the grand jury subpoena. Because we conclude that production would violate his fifth amendment rights, we affirm the district court order quashing this portion of the subpoena duces tecum directed against his attorneys.

"The fifth amendment protects against 'compelled self–incrimination, not [disclosure of] private information.'" *Fisher v. United States,* 425 U.S. 391, 401, 96 S.Ct. 1569, 1576, 48 L.Ed.2d 39 (1976), *quoting United States v. Nobles,* 422 U.S. 225, 233 n.7, 95 S.Ct. 2160, 2167 n.7, 45 L.Ed.2d 141 (1975). This proposition in no way contradicts the proposition to which we today adhere: that the fifth amendment protects an accused from government–compelled disclosure of self–incriminating private papers, such as purely personal date books.

■ This can hardly be characterized as novel. It is a firmly embedded tenet of American constitutional law that the fifth amendment absolutely protects an accused from having to produce, under government compulsion, self–incriminating private papers. As the Supreme Court has said "the Fifth Amendment privilege against compulsory self–incrimination protects an individual from compelled production of his personal papers and effects as well as compelled oral testimony." *Bellis v. United States,* 417 U.S. 85, 87, 94 S.Ct. 2179, 2182, 40 L.Ed.2d 678 (1975). *See, e. g., United States v. Calandra,* 414 U.S. 338, 346, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974); *Couch v. United States,* 409 U.S. 322, 330, 93 S.Ct.

---

**13.** *See, e. g., In re National Glass Workers,* 287 F. at 227–28 (finding that dominant purpose of grand jury subpoena was to obtain evidence for trial warranted setting aside subpoenas); *United States v. Doe,* (Application of Ellsberg), 455 F.2d 1270, 1274 (1st Cir. 1972) (First Circuit ordered transcripts of Massachusetts based grand jury witness examinations to be made available to California court so that the California court could ascertain whether witnesses had been called before Massachusetts grand jury primarily to gather evidence for the pending California trial, which would require suppression of that evidence).

**14.** The district court permitted Johanson to intervene for the purposes of litigating the motion to quash the subpoena. The court, in selectively quashing part of the subpoena, relied on Johanson's fifth amendment privilege. Technically speaking, however, it is the attorney–client privilege which the attorney must assert to quash the subpoena. *Fisher v. United States,* 425 U.S. 391, 396–97, 96 S.Ct. 1569, 1573–1574, 48 L.Ed.2d 39 (1976). The scope of the attorney–client privilege does, however, envelop the client's fifth amendment privilege to protect the client's right against self–incrimination.

611, 616, 34 L.Ed.2d 548 (1972); *United States v. White*, 322 U.S. 694, 699 & 701, 64 S.Ct. 1248, 1252, 88 L.Ed. 1542 (1943); *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

No case has held to the contrary.[15] In *Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976), the Supreme Court held that production of an accountant's papers did not violate the taxpayer's fifth amendment rights. Plainly, the question whether the compelled production of the taxpayer's own papers would have violated his fifth amendment was not before the *Fisher* court. The fifth amendment doctrine protecting an accused from producing incriminating private papers manifests its vitality by virtue of the *Fisher* court's explicit efforts to distinguish its facts from the facts in *Boyd*, 425 U.S. at 414, 96 S.Ct. at 1582.

 Moreover the policies underlying the fifth amendment proscription against compelled self–incrimination support protection of an accused from having to produce his private papers. One well recognized policy stems from "our respect for the inviolability of the human personality and of the right of each individual 'to a private enclave where he may lead a private life'...." *Murphy v. Waterfront Commission*, 378 U.S. 52, 55, 84 S.Ct. 1594, 1597, 12 L.Ed.2d 678 (1964). The fifth amendment "respects a private inner sanctum of individual feeling and thought and proscribes state intrusion to extract self–condemnation." *Couch v. United States*, 409 U.S. 322, 327, 93 S.Ct. 611, 615, 34 L.Ed.2d 548 (1972). The fifth amendment in its self–incrimination clause enables the citizen to create a zone of privacy which government may not force him to surrender to his detriment. *Griswold v. Connecticut*, 381 U.S. 479, 484, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965).

Nor are these expressions of allegiance to the concept that a man ought not to be compelled to produce his private papers for use against him in a criminal action without relevance to modern American society. Our society is premised on each person's right to speak and think for himself, rather than having words and ideas imposed upon him. This fundamental premise should be fully protected. Committing one's thoughts to paper frequently stimulates the development of an idea. Yet, persons who value privacy may well refrain from reducing thoughts to writing if their private papers can be used against them in criminal proceedings. This would erode the writing, thinking, speech tradition basic to our society.

But it is not the policies of privacy alone which underlie our refusal to permit an accused to be convicted by his private writings. We believe that the framers of the Bill of Rights, in declaring that no man should be a witness against himself in a criminal case, evinced "their judgment that in a free society, based on respect for the individual, the determination of guilt or innocence by just procedures, in which the accused made no unwilling contribution to his conviction, was more important than punishing the guilty." [16]

The idea that an accused is entitled to certain rights developed slowly. But the Anglo–American theory of criminal justice has taken many steps, albeit one at a time, since the days of Star Chamber and the High Commission.[17] In *Entick v. Carrington*,[18] an English decision issued in 1765, the foundation was laid disallowing conviction on the basis of government seized private papers of the accused. It was not just the intrusion of the search which offended the Court, but the compelled use of a man's private papers as evidence used to convict him.[19] As Lord Camden, writing for a

---

15. *I. C. C. v. Gould*, 629 F.2d 847, at 859 (3d Cir. 1980).

16. L. Levy, Origins of the Fifth Amendment 432 (1968).

17. *See generally* L. Levy, note 16 *supra* (1968).

18. 19 How.St.Tr. 1029 (1765).

19. Lord Camden declared that the existence of the power of search would "open the secret cabinets and bureaus of every subject in this kingdom," and this search for private papers was prohibited because "the law obligeth no

unanimous court recognized, "papers are often the dearest property a man can have."[20]

The American origins of this right may be seen as early as 1776 in the constitution of Virginia. Section 8 of the Virginia Declaration of Rights, in the midst of the enumeration of the rights of criminally accused, declared: Nor can he be compelled to give evidence against himself.[21] Since an accused person at that time in Virginia was not permitted the right to testify at his trial, "he could neither be placed on the stand by the prosecution nor take the stand if he wished",[22] the guarantee secured by the Virginia constitution would have been meaningless, unless it meant that by not being "compelled to give evidence against himself" that an accused could not be forced to give his private writings to be used as evidence against him in a criminal trial.

But even if the somewhat obscured origin of this right dates back only one century, to the decision in *Boyd*, it has been staunchly heralded as a basic right of an accused. We believe that failure to continue to preserve this right, which we believe basic, would be a step backward in what has been a long and bitterly contested battle to accord rights to persons who stand accused of crime.[23]

Therefore, we do not believe that the government can compel production of the pocket date books of Johanson, which are his wholly personal papers, without violating his guarantees under the fifth amendment. These books were his own, kept on his person, with all entries recorded by him, not by third persons. We believe he had a rightful expectation of privacy with regard to these papers. His fifth amendment privilege is transferred to protect the same documents when in Johanson's attorneys' hands by an effective merger with the attorney–client privilege. For this reason, we affirm the district court decision to quash the portion of the subpoena duces tecum ordering production of Johanson's private papers, his personal date books.

man to accuse himself; because the necessary means of compelling self accusation, falling upon the innocent as well as the guilty, would be both cruel and unjust." State Trials, XIX, at 1029, 1038, 1041, 1063 (1765); *quoted in* L. Levy, *supra* note 16 at 393. *See* Note, Constitutional Privacy, 90 Harv.L.Rev. 945, 954 ·55 (1977).

**20.** O. J. Rogge, The First and the Fifth, 178 (1949) (quoting Lord Camden with respect to the *Entick* case).

**21.** Virginia Declaration of Rights, Section 8, *Quoted in* L. Levy, *supra* note 16 at 405–06.

**22.** L. Levy, *supra*, note 16 at 406 07.

**23.** Although some commentators have predicted the demise of this fifth amendment right, Note, Constitutional Privacy, 90 Harv.L.Rev. 945 (1977); Gerstein, *The Demise of Boyd*, 27 U.C.L.A. L.Rev. 343 (1979), we explicitly reject the prophecy.